220 So.2d 580 (1969)
Lula Mae BRIGNAC, widow of Norris A. VICKNAIR
v.
AVONDALE SHIPYARDS, INC.
No. 3376.
Court of Appeal of Louisiana, Fourth Circuit.
March 3, 1969.
Rehearing Denied April 7, 1969.
Malik & Richard, Thomas J. Malik, La Place, for plaintiff-appellee.
Jones, Walker, Waechter, Poitevent, Carrere & Denegre, James L. Selman, II, New Orleans, for defendant-appellant.
Before REGAN, SAMUEL and REDMANN, JJ.
REGAN, Judge.
The plaintiff, Lula Mae Vicknair, filed this suit against the defendant, Avondale Shipyards, Inc., endeavoring to recover death benefits and funeral expenses in conformity with the provisions of the Louisiana Workmen's Compensation statute which she insists she is entitled to as the result of her husband, Norris A. Vicknair, dying from a heart attack incurred during the course and scope of his employment by the defendant.
The defendant answered and asserted therein that the death of the plaintiff's husband was not causally connected with or related to his employment by Avondale Shipyards, Inc.
Following a trial on the merits, judgment was rendered in favor of the plaintiff awarding her the sum of $35.00 per week for 400 weeks together with $600.00 for funeral expenses.
From that judgment, the defendant has prosecuted this appeal.
The record discloses that on the morning of May 6, 1966, Norris A. Vicknair, the plaintiff's deceased husband, awoke and prepared to go to his place of employment as a caulker at Avondale Shipyards, Inc.
He arrived there at approximately 7:00 A.M., the normal time for him to commence his daily employment. However, before he began to work, he complained of indigestion, and his foreman, Gilbert Prestenback, suggested that he visit the first aid station for relief of his symptoms. He did so and was administered Emetrol and Maalox. He then began his normal occupational duties of caulking the deck plates of a barge under construction in the shipyard.
*581 Later in the morning he again complained to Prestenback that, while he was feeling better, he still was experiencing some discomfort in the abdominal region, and Prestenback again suggested that he visit the first aid station. The record is not clear whether he visited the first aid station at this time. However, at approximately 2:30 that afternoon, he returned there and was given a dose of soda for symptoms which he again described as indigestion. At approximately 3:00 P.M., he was seen by S. J. Brumfield, a fellow employee, on his way to a foreman's shack riding on a tractor. About fifteen minutes later, the first aid station was notified that Vicknair collapsed in the foreman's shack, and he was pronounced dead after efforts to revive him proved to be of no avail.
The record discloses that the decedent's duties as a caulker consisted of the sealing of overlapping edges of steel plates of vessels by use of an air operated hand tool or caulking gun. This gun vibrated at an extremely high rate of speed, which was estimated to be in the area of 2,500 times per minute. The gun weighed approximately 5 or 6 pounds, and performed its function as a result of the heat generated by the extreme vibration of the gun. In other words, under pressure of its operator, the friction created by this tool against the steel plate generated intense heat so that the steel becomes pliable and the chisel like edge of the gun then seals the overlapping edges of the plate thereby making it water tight.
On the day that his death occurred, Vicknair was caulking the deck plates of a barge, and it was explained that this work could have been performed in a kneeling or a sitting position. However, it was never established precisely what position or posture Vicknair assumed while he was engaged in the performance of this task.
On the day after Vicknair's death, an autopsy was performed by Dr. C. M. Wascom, on behalf of the Jefferson Parish Coroner's Office. He was conceded to be an expert in both clinical and anatomical pathology, and he testified after reference to his autopsy protocol that Vicknair died as a result of a recent coronary thrombosis of the anterior descending branch of the left coronary artery, an acute myocardial infarction of the left anterior ventricle, acute pulmonary edema and congestion of both lungs, arteriosclerotic heart disease, fibrosis of the left anterior lateral left ventricle, hypertrophy of the heart, and generalized arteriosclerosis. This doctor explained that his examination revealed an enlarged heart and arteriosclerotic conditions of the decedent's circulatory system. His examination also disclosed the existence of a previous myocardial infarction, completely unconnected with Vicknair's death, of which he apparently possessed no knowledge. Moreover, it finally revealed an acute myocardial infarction of the anterior left ventricle, which the physician estimated occurred between 24 and 48 hours before the moment of death. This hypothesis was predicated upon the mottled color of the area of the heart encompassed by the infarction and the existence of necrotic tissue in the coronary artery.
He asserted that the immediate cause of death was acute and severe pulmonary edema and congestion of both lungs, by virtue of which the decedent's lungs eventually filled with body fluids causing him, in effect, to drown in his own blood. When questioned with respect to this condition, the pathologist testified as follows:
"Q: Was this the result of or contributed to the decedent's death?
"A: This is actually what killed the patient, yes, as a result of heart failure. Heart failure is not an anatomical diagnosis; this is a clinical diagnosis."
In substance, the pathologist asserted that while the decedent incurred the infarction some time prior to his death, the proximate cause thereof was the edema which occurred while he was at work. He related that instead of Vicknair's coming to work on the day of his death, he should *582 have remained in bed, under sedation, or more properly, he should have been under extremely watchful medical supervision in a competent hospital. This pathologist then made the following significant statement:
"Q: Should have been absolutely at bed rest?
"A: Yes. His chances of survivalhe could have survived this so-called silent coronary, he may have survived, you know. Nobody can say he wouldn't have survived, but any exertion would throw him into failure probably and this is what he didhe died in heart failure with congested lungs, this is what killed him. He died of heart failure. This is what killed him. The cause of his heart failure was the myocardial infarction and his coronary thrombosis. When we put people in the hospital, we hope we are not going to let people go into heart failure. That's why we put them there. We are trying to keep them from heart failure, with complete bed rest, to keep all strain off the heart as much as possible." (Emphasis added.)
The plaintiffs also produced Dr. Emmett Luke Hebert, who testified as an expert in the field of internal medicine. He saw him some time previous to the date of Vicknair's death, and performed tests, including an electrocardiogram, to determine the condition of the decedent's heart. The only positive finding which he had at that time was a slightly elevated cholesterol count, which returned to normal after the decedent undertook an appropraite diet. However, at that time, there was no evidence of heart disease. He asserted that the actual cause of death was the acute pulmonary edema, and that Vicknair should have been hospitalized, put on oxygen, started on coagulants, and given intensive supportive therapy to relieve any strain upon his heart. Quite significantly, he explained that from the history obtained from the autopsy protocol there was nothing other than the physical activity of the decedent's occupation on the day of his death which was attributable to or could have precipitated the death.
The defendants offered the medical testimony of Dr. Samuel Nadler, who appeared herein as a specialist in internal medicine. While Dr. Nadler's testimony is in some instances contradictory, it may be summed up by stating that he concluded that the cause of death was the recent myocardial infarction, which occurred between 24 and 48 hours prior to the death of Vicknair. However, the following testimony of Dr. Nadler is of interest:
"Q: Knowing that he had complaints of what he felt was stomach disorder, can we attribute his medical decline on the day of his death to nothing other than the fact he was up and around performing usual duties in the scope of his employment?
"A: I said if he remained at absolute bed rest * * *
"Q: We know he didn't. The fact he didn't can we attribute his medical decline to anything else other than the fact that he moved around and performed his usual duties?
"A: Not as far as I can see."
Complications in proving causation of death arise from the fact that the natural progress of preexisting heart infirmities can produce disability at any moment irrespective of any outside influence. However, it is well settled that the rationale of our jurisprudence uniformly recognizes that benefits are due in compensation cases involving heart conditions resulting in disability or death, whether or not the condition is preexisting, when caused, precipitated, or accelerated by even the usual and customary activities, exertions, and other factors directly connected with the employment.[1] *583 In many cases of this nature,[2] two questions are usually posed for the court's consideration: (1) was the immediate cause of the death a heart failure or myocardial infarction and (2) if so, did the plaintiff prove by a preponderance of the evidence that the decedent's work brought on, precipitated, or accelerated the fatal heart attack.
In view of the fact that the medical testimony adduced herein clearly discloses that the immediate cause of the death was the pulmonary edema resulting from the myocardial infarction, the only question posed for our consideration is one of fact, and that is whether the decedent's work, which we are convinced was in the nature of heavy physical duty, brought on, precipitated, or accelerated the fatal heart attack. The trial judge obviously accepted the medical testimony which established as a reasonable probability the plaintiff's version of the manner in which the decedent's death occurred, and, therefore, concluded that his fatal heart attack was either caused, precipitated or accelerated by the decedent's usual and customary activities and exertions connected with his employment.
The question which this appeal has, in the final analysis, posed for our consideration is whether that finding of the trial judge was so erroneous and unsupported by the medical and other evidence adduced herein so as to warrant a reversal by us.
We are of the opinion that no useful purpose would be served by indulging in a protracted discussion of the foregoing medical testimony or by endeavoring to reconcile the respective litigants' version of the manner in which the fatal heart attack occurred. The trial judge accepted the plaintiff's version thereof, and our analysis of the record convinces us that the evidence preponderates in her favor and the judgment is, therefore, correct.
For the foregoing reasons, the judgment of the lower court is affirmed.
The defendant is to pay all costs incurred herein.
Affirmed.
NOTES
[1] Franklin v. Old Colony Insurance Company, La.App., 150 So.2d 892 (1963); Andrepont v. Calcasieu Paper Co., La. App., 131 So.2d 585 (1961); Talbot v. Trinity Universal Insurance Company, La.App., 99 So.2d 811 (1958); Hemphill v. Tremont Lumber Co., 209 La. 885, 25 So.2d 625 (1946); Dusang v. Liberty Mutual Insurance Company, La.App., 195 So.2d 340 (1967); Landry v. Park Wood Products, Inc., La.App., 201 So.2d 306 (1967); Prater v. Liberty Mutual Insurance Company, La.App., 182 So.2d 805 (1966); Turner v. Howard Motors, Inc., La.App., 192 So.2d 205 (1966).
[2] See Franklin v. Old Colony Insurance Company, La.App., 150 So.2d 892 (1963).