265 So.2d 628 (1972)
Mrs. Adele WEBER, Plaintiff-Appellant,
v.
McLEAN TRUCKING COMPANY, Inc., et al., Defendants-Appellees.
No. 3916.
Court of Appeal of Louisiana, Third Circuit.
August 4, 1972.
*629 Garrett & Ryland by Donald M. Garrett, Michael M. Wahlder, Alexandria, for plaintiff-appellant.
Stafford, Pitts & Bolen by John L. Pitts, Alexandria, for defendants-appellees.
Before FRUGÉ, HOOD and DOMENGEAUX, JJ.
DOMENGEAUX, Judge.
This is a workmen's compensation suit brought by Mrs. Adele Weber, the widow of Mr. Eugene V. Weber, to recover Workmen's Compensation benefits and funeral expenses for the death of her husband. At the time of his death, Mr. Weber was employed by defendant, McLean Trucking Company, Inc., as a heavy truck driver. There is no dispute as to plaintiff's right to recover if it is shown that her husband's death was caused by work performed for his employer. The trial court found that his death was not causally related to his work. We reverse.
At the time of his death on June 6, 1970, Mr. Weber had been employed by the defendant for some 12 to 14 years as a driver of heavy trucking equipment. He was so engaged on the day before his death and on the morning of the day of his death.
On June 5, 1970, Mr. Weber drove one of the defendant's vehicles from Alexandria, Louisiana, to Memphis, Tennessee. He spent the night in Memphis and went on duty the next day, June 6, at 4:45 A.M. At 5:15 A.M. he pulled out of Memphis to return to Alexandria. The vehicle Mr. Weber was driving at this time was a 1968 Mack F. Model type cab tractor-trailer truck having a maximum weight capability of 72,500 pounds on a 45 foot floating tandem. He drove for 45 minutes until he reached Tunica, Mississippi, where he had a one-hour layover. He resumed his trip at 7:00 A.M. and drove continuously until he reached Alexandria shortly before 2:00 P.M.
He entered the company office very briefly, handed in his log sheet and went out to join his married daughter and her husband who were waiting for him.
Immediately upon entering their car he complained of extreme fatigue and chest pains. His son-in-law drove them all home to Centerpoint, a 30-minute drive, and when Mr. Weber arrived he told his wife that he was extremely tired. He ate very little, read the paper for a few minutes and then went to bed for a short time. Later, he was present at the loading of some of his cattle for a rodeo. Calves were loaded at two different places on his land and he was driven to both spots. The only assistance he offered at either time was to call several times to the calves to get them to come to the truck. At the second loading site, he walked out about 15 steps into the corral, called once or twice, lurched backwards violently and died without making any outcry. The time of his death was placed at between 5:00 and 5:30 P.M. He left a widow, and a married daughter. Everyone who saw Mr. Weber after his return trip that day said he looked pale, was not very talkative and did not look well-all contrary to his normal state of being.
The first witness called was Mrs. Barbara Elaine Cole, Mr. Weber's married daughter. She testified that she and her husband picked up her father at the terminal just shortly before 2:00 P.M. and that immediately upon entering the car her father told her that he was ". . . real, real tired . . ." and that he had chest pains. When they reached home, the deceased again told his daughter that he was *630 tired. He ate very little of his favorite meal which had been prepared for him.
Mrs. Adele Weber, the deceased's wife and plaintiff in this suit, testified that when her husband reached home at 2:30 P.M., "I asked him how he felt and I could look at him and tell he wasn't right, the color in his eyes. He said he was awfully, awfully tired, unusually tired, it was. To use his words he said he was just completely sapped out." He ate very little because "to him it was too hot to eat" and contrary to his usually gregarious nature, he was not very talkative.
Mr. Weber's son-in-law, Wayne Cole, also testified and related that when he picked decedent up just before 2:00 P.M., decedent told him that he had had a hard trip, felt bad, and had chest pains. Mr. Cole said that decedent "didn't look good" and "didn't have his color at all." He also remarked that Mr. Weber did not talk much at all.
Mr. Kenneth Cole, a neighbor who came to take the calves to the rodeo area, testified that decedent did not exert himself at all physically at the calf loading and that the only assistance offered by Mr. Weber was a few cattle calls he gave to get the calves to the truck.
Also called by plaintiff was Mr. Merritt L. Luneau, Jr., who had known the decedent for 10 years. Mr. Luneau has worked out of Alexandria for almost 10 years as an interstate truck driver for Red Ball Freight but was presently self-employed.
He testified that he was familiar with the type of truck decedent drove on the day of his death. It has no power steering and the engine runs under the cab and parallel to the right leg of the driver for a distance of about three-fourths of the length of the cab. There is no insulation between the engine and the driver except a covering of fiberglass over the engine. Therefore, with the temperature of the engine ranging from 185-190, the cab, in which there is no air conditioning and poor ventilation remains 10-30 hotter than the temperature outside of the cab. Mr. Luneau stated that after five miles of such driving he would become soaking wet with perspiration and remain that way for the entire trip. He further stated that exhaust fumes would frequently become a problem in the cabs of such trucks.
Mr. Luneau stated that the route taken by decedent from Memphis on June 6, 1970, was Highway 61 South to Leland, Mississippi; U. S. 82 to Lake Village, Arkansas, and U. S. 165 to Alexandria. He said that Highway 61 was a very narrow highway and the roughest road in the South. "It was just about impossible to stay on the road at times. . . . The concrete was broken all to pieces and with a large truck and trailer, even in a car or an automobile, it was just hard to stay on top of it because it was bad." He described heavy truck driving in general and on this route in particular as a ". . . heavy mental strain and physical strain," due to the fact that such heavy loads constantly shift and roll, throwing the truck off balance and necessitating a constant strain and struggle to keep the truck on the road and in the proper lane.
Also called by plaintiff was Mr. Louis J. Jarrel who was employed by defendant company at the time of Mr. Weber's death. He has 15-20 years experience as an interstate truck driver. He stated that Highway 61 was very narrow and rough"real rough". There was significant difficulty in maintaining a truck in its proper lane in the face of oncoming traffic.
He stated that the fiberglass insulation found in the type of truck driven by Mr. Weber covered only the sides and not the top of the engine as it passed parallel to the driver. The result is that the temperature in the cab is 10°-30° hotter than outside the cab ". . . plenty of heat comes in there." Both the steering and the shift are manual.
*631 He observed that Mr. Weber was "pale looking" upon his arrival from Memphis on June 6, 1970.
The only lay witness called by defendants was Mr. Julius J. Bordelon, the Alexandria terminal manager for defendant company. When asked if Mr. Weber complained to him about any pain or difficulty on June 6, Mr. Bordelon replied, "I didn't get a chance to talk to him."
The first doctor called by defendant was Dr. John Wenton Deming, an internist-cardiologist. There are inconsistencies in his testimony and it is evident that his conclusions stem from erroneous or inaccurate facts which he was furnished with.
The hypothetical questions propounded to Dr. Deming attempted to set forth the facts surrounding the events of June 6, 1970. They were incomplete, and the record amplifies the conclusion that Dr. Deming was irretrievably affected by these assumptions. The hypothet relating the events of June 6 showed that the decedent was a truck driver but did not mention the enormous size of the truck, the difficulty in driving it or the extreme heat encountered in the cabs of these trucks. Furthermore, no mention was made of the peculiar nature of the highway traveled by Mr. Weber on the day of his death. As a result, Dr. Deming was left in the dark as to the stress to which Mr. Weber had been subjected because Dr. Deming had no independent knowledge of the mechanics involved in operating these heavy trucks. He admitted that "I don't know too much about trucks", and when asked if he were in a position to gauge the heat inside the cab he said "I wouldn't think so." He admitted that he based his opinions on the outside temperature as correctly related by defense counsel. The highest temperature related to the doctor by defense counsel was 82° which was recorded on an official weather report. This, however, ignores the direct testimony of two experienced interstate truck drivers that the temperature inside the cab would be from 10°-30° higher than outside. Furthermore, defense counsel failed to mention that these same weather reports showed fog and high humidity all along Mr. Weber's route. It was pointed out (shown later) that extreme heat and high humidity tax the heart heavily, and as admitted by Dr. Deming ". . . if a man got over-heated it would have a bad effect on all aspects of heart disease . . ." Dr. Deming's opinion that the driving that day was not related to Mr. Weber's death, was substantially based on the assumptions that ". . . the temperatures were reasonable that day, not unpleasant . . ."
His lack of the appreciation of the difficulty of driving these tremendous trucks, especially on such bad roads as Highway 61 is gleaned from the following statement: "Well I would assume that driving one of these trucks now-a-days with no uneventful happenings and what-not like a blow-out or a flat tire or what-not would come within the normal range of ordinary activities that most of us perform. I would just assume that. I could be wrong there, . . ." He also assumes that Mr. Weber had been driving since November, 1969, (following an operation he mentioned later) while the record shows he did not resume driving until sometime after January 1, 1970.
As a result, the other major foundation upon which Dr. Deming based his opinion was the total inaccuracy that ". . . the conditions he drove under that day were without any unusual stress or strain."
When asked if the driving could have precipitated Mr. Weber's death if it had been stressful, Dr. Deming replied, "If he was under unusualyou knowunder unusual stress. I don't know exactly how the law reads about that but if he was under unusual stress or in unhealthy working conditions, I would say yes. I don't know whether his were, I just don't know what the law says there." (Emphasis added.)
Another fault we find with Dr. Deming's conclusion is his assumption that Mr. *632 Weber died of idiopathic hypertrophic subaortic stenosis. He states that since there was no evidence of symptoms of any coronary insufficiency upon Mr. Weber's arrival in Alexandria on June 6, Mr. Weber did not die as a result of the driving.
Dr. Deming first saw Mr. Weber in 1963 for a heart murmur. In 1965, he saw him again for shortness of breath after a bout with pneumonia. After this time, Mr. Weber saw Dr. John Rozier who referred him to Drs. William L. Winters, Jr. and George C. Morris, Jr. of Houston, Texas, in March, 1969. In August of 1969, these doctors performed corrective surgery on Mr. Weber for a condition they diagnosed as idiopathic hypertrophic subaortic stenosis. After returning to Centerville, Mr. Weber was admitted to Baptist Hospital in Alexandria twice and was seen on one of these occasions by Dr. Deming. Mr. Weber suffered from atrial fibrillation on April 27, 1970. Dr. Deming saw Mr. Weber immediately after his death, but no autopsy was performed.
After stating that Mr. Weber died of hypertrophic subaortic stenosis, Dr. Deming described this condition as being basically a narrowing of the outflow track of the left ventricle which embarrasses the flow of arterial blood to the body. He stated that this obstruction increases with exertion. According to Dr. Deming, this condition is "Notoriously poor in its response even to surgery."
Dr. Deming admitted that such a condition can cause a loss of blood flow to the coronary arteries resulting in a myocardia infarct and death. He also admitted that such infarcts are preceded by pain, discomfort, fatigue, and a general condition of not feeling well. He further admitted that an event or exertion can cause such a condition without producing instant death and that a person so suffering may live for some time via collateral circulation and later die from the condition induced hours before. Dr. Deming stated that Mr. Weber could have died as a result of an infarct, however, Dr. Deming did not think that this was likely due to his assumption that Mr. Weber did not ever experience any chest pain, "I'm impressed by the fact that this man never had any chest pains." This "fact" was assumed by Dr. Deming solely on the basis of the reports of the Houston physicians. He admitted that he would probably change his diagnosis if it were shown that Mr. Weber had suffered from chest pains upon completing his truck route.
It is interesting to note that in Dr. Deming's report of October 9, 1969, he recorded evidence of an old posterior wall infarct. He changed his mind about this after reading the Houston reports and "realizing" that what he had actually seen was evidence of hypertrophic subaortic stenosis an error he says it is easy to make. However, he does admit that the diagnosis of infarct could have been correct, "Now that doesn't mean he couldn't have had one. I can't say he didn't . . ." If he had had previous infarcts this would be some evidence of coronary heart disease which Dr. Deming had dismissed as unlikely due to the "fact" that Mr. Weber had never experienced chest pains.
Interesting also are the assumptions by Dr. Deming that Mr. Weber had not complained of feeling badly upon reaching Alexandria on June 6, that any ill feeling on his part had disappeared upon reaching home; and that he had eaten lunch, rested and felt like moving about (he assumes any adverse effect from driving had dissipated after Mr. Weber reached home, and therefore, the deadly attack was unrelated to the trip). The first assumption runs contrary to the statements of Mr. and Mrs. Cole that Mr. Weber did complain of extreme fatigue and chest pains at the terminal. The second assumption is refuted by the statements of decedent's wife and Mr. and Mrs. Cole that decedent was pale and tired, ate little and seemed listless. When confronted with these facts, Dr. Deming replied, "I hadn't really thought through that."
*633 Accordingly, we believe that the testimony of Dr. Deming is diminished in value for, as was said in Keener v. Fidelity and Casualty Company of New York, 96 So.2d 509 (La.App.):
It is a cardinal rule that for an expert opinion to be of value the reality of the state of facts upon which such an opinion is predicated must be shown to exist. An opinion based on assumed facts, varying materially from the actual facts, is without probative value and is insufficient to sustain a judgment. Neither is a medical opinion entitled to weight which is predicated upon an incorrect assumption of facts.
Next to testify was Dr. John Rozier, a general practitioner who had treated Mr. Weber off and on since March, 1969.
The only improvement on the hypothetical question put to Dr. Rozier over that put to Dr. Deming was that there was no air conditioning or power steering in the cab. However, it contained a statement that Mr. Weber did not mention having trouble to any of the company personnel upon arriving in Alexandria. The record shows the reason he did not make mention of his trouble is that he did not have time he stayed only briefly in the terminal.
Dr. Rozier stated that he did not believe that the driving caused Mr. Weber's death, but giving his foundation for such an opinion he said, "I am giving an opinion based on the fact that he had not involved in any unusually strenuous or exhausting type of work as far as I know." He stated that Mr. Weber had previously told him his truck driving work was not strenuous, but he admitted that economic pressures were on Mr. Weber to regain his employment (Dr. Rozier initially wouldn't let him drive) and that Mr. Weber probably distorted the facts of his employment. He would not have let him return to work if he had known that the work called for Mr. Weber to travel over bad, arduous routes under hot conditions.
The doctor admitted that extreme heat adds to the burden of the heart, and that Mr. Weber could have had a myocardia infarct as a result of his driving and died some hours later. He did not believe that this was very likely because Mr. Weber had no history of chest pains. Dr. Rozier did admit though that after the operation in Houston, Mr. Weber had two episodes of fever and chest pain which were "presumed" to be a result of post-thoracotomy syndromesomething that just "happens" to a patient after this type of operation.
Perhaps the most informative statement made by Dr. Rozier is his answer to the question as to decedent's cause of death. "I can only speculate, of course, but presumably heart disease, exact nature of which I don't know."
Dr. Rozier's opinion suffers from the same defects as Dr. Deming's and is likewise accorded little weight under the jurisprudence as set forth in Keener v. Fidelity and Casualty Co. of New York, supra.
Called by plaintiff by way of sworn deposition was Dr. Robert Freedman, an expert cardiologist. He testified that the operation performed by the Houston doctors ". . . is a notoriously poor procedure the results are not good, and usually it's done when they feel like the situation is desperate". He stated that the result of this operation was a relative decrease in the coronary flow, and he felt that Mr. Weber died of coronary insufficiency.
The doctor stated that any driving is stressful and that the bigger the vehicle the more work and more stress. If the truck had no power steering, the work would be harder and if there was no air conditioning, the oxygen exchange would be poor as heat and high humidity cause fatigue and a poor exchange of oxygen. In short, the type of driving Mr. Weber was doing is "heavy work" and the doctor was surprised that the insurance company let him work at that type of job after his *634 operation. He stated that it definitely could not be assumed that Mr. Weber had adjusted to his work so as to be able to withstand all the strains of his job ". . . this would all depend on the circumstances, on the time, the length of time he drove, the weather, and his personal condition too . . ."
The pain and fatigue felt by Mr. Weber were probably a result of this poor oxygen exchange and indicated coronary insufficiency and possibly an impending coronary occlusion. The doctor stated that there was a good possibility that the driving of June 6, 1970, aggravated Mr. Weber's condition and caused his death. He would not say that the work precipitated the death but this was only because Mr. Weber might have died without doing any work. It seems to us, as it did to Dr. Freedman, that under such circumstances, it is even more probable that the strenuous driving done by Mr. Weber on June 6 resulted in his demise.
A statement of law peculiarly appropriate to the case at hand is the following:
Complications in proving causation of death arise from the fact that the natural progress of preexisting heart infirmities can produce disability at any moment irrespective of any outside influence. However, it is well settled that the rationale of our jurisprudence uniformly recognizes that benefits are due in compensation cases involving heart conditions resulting in disability or death, whether or not the condition is preexisting, when caused, precipitated, or accelerated by even the usual and customary activities, exertions, and other factors directly connected with the employment. In may cases of this nature, two questions are usually posed for the court's consideration: (1) was the immediate cause of the death a heart failure or myocardial infarction and (2) if so, did the plaintiff prove by a preponderance of the evidence that the decedent's work brought on, precipitated, or accelerated the fatal heart attack. Vicknair v. Avondale Shipyards, Inc., 220 So.2d 580 (La.App.).
As far as the discharge of plaintiff's burden of proof relative to the cause of Mr. Weber's death, as well as its relation to his work, we find the following quote from the jurisprudence dispositive of the issue in plaintiff's favor.
A court, in applying medical evidence to facts in a case of this kind, has to apply common sense and everyday experience to correctly resolve a situation. We know medical science knows more about these things than we do, and our experience has been, from hearing testimony of this kind, that when a doctor says "possible" or "probable", he does not mean that it did not happen as contended in the sense that an ordinary layman would understand his words. In giving their testimony, all medical experts try to give guarded testimony, and some courts try to draw a distinction between possibilities and probabilities. To our way of thinking and to the modern trend of the courts in considering these terms, we should look at them in a common-sense way.
". . . A doctor's use of such words as `might', `could', `likely', `possible' and `may have', coupled with other credible evidence of a non-medical character, such as a sequence of symptoms or events corroborating the opinion, is sufficient to sustain an award. . . ." Larson's Workmen's Compensation Law, Vol. 2, § 80.32, page 322.
Sharp v. Esso Standard Oil Co., 72 So. 2d 601 (La.App. 1st Cir., 1954).
We believe that Dr. Freedman's statements concerning aggravation (the only acceptable medical opinion offered) should be read in light of the corroborating facts of this case. Mr. Weber, suffering from a severe heart ailment, undertook to drive an extremely large truck from Alexandria to Memphis and back in less than 48 hours. The route over which he traveled was, in *635 part, one of the most difficult in the South to navigate. His truck was not equipped with power steering or air conditioning and due to the arrangement of the engine and cab, the temperature in the cab was from 10°-30° higher than the 80°-82° temperature outside. Ventilation was extremely poor in the cab and the humidity was high. After traveling for more than six straight hours under these conditions, he reached Alexandria at 2:00 P.M. There he very briefly reported in and then went to meet his daughter. Upon seeing her, just a few moments after alighting from his truck, he complained of extreme fatigue and chest pains and appeared very pale. He arrived at home still complaining of oppressive fatigue and was so overheated he could not eat much. He remained tired and listless the rest of the afternoon. With practically no further physical exertion, he dropped dead sometime between 5:00 and 5:30 P.M. that same day.
Upon reviewing these facts in view of Dr. Freedman's opinions we find that the drive of June 6, peculiarly strenuous even under trucking standards, caused a coronary insufficiency which continued unabated until that afternoon and then caused Mr. Weber's death.
The record herein contains a stipulation that in the event of recovery the plaintiff would be entitled to maximum weekly compensation as authorized under LSA-R.S. 23:1231 & 1232. (The decedent's weekly wages were $200.00.)
The burial expenses in connection with the death of Mr. Weber was shown to be $1,157.83 but the allowance therefor will be limited to the statutory extent as provided for in LSA-R.S. 23:1210.
For the above and foregoing reasons the judgment of the District Court is reversed and set aside, and it is now Ordered, Adjudged and Decreed that there be judgment herein in favor of plaintiff, Mrs. Adele Weber, and against the defendants, McLean Trucking Company, Inc. and Transport Insurance Company, individually and in solido, condemning them to pay to plaintiff the sum of $49.00 per week commencing June 6, 1970, for a period not to exceed 500 weeks with legal interest on each weekly installment from the date of its maturity until paid, together with the sum of $1,000.00 for burial expenses with legal interest thereon from date of judicial demand until paid.
All costs in this and in the District Court are assessed against defendants-appellees.
Reversed and rendered.
HOOD, J., dissents, being of the opinion that the judgment rendered by the trial court is correct.