DOMENGEAUX, Judge.
This is a workmen’s compensation suit. Plaintiff-appellee, Leola J. Milton, was injured while in the employ of J. C. Penney Company, Inc., and instituted this action against her employer and its insured, Liberty Mutual Insurance Company, to recover benefits under the workmen’s compensation act. The District Judge found that plaintiff was totally and permanently disabled as a result of the work-related accident and rendered judgment in her favor from which the defendants have appealed.
The defendants do not dispute the fact that plaintiff was involved in an employment-related accident and that she is now totally and permanent disabled. The sole issue raised by this appeal is whether plaintiff’s accident is causally related to her disability.
Plaintiff was a 49-year old woman employed by J. C. Penney Company, Inc., as a janitress in Alexandria, Louisiana. On March 12, 1974, while in the process of mopping the floor she slipped and fell, essentially performing a split-type maneuver, striking her left knee on the floor with her right leg extended in front of her. She then fell over on her left side striking her left shoulder on the floor and apparently twisting her right knee in the process. She was taken immediately to the office of Doctor Francis M. Brian, a general practitioner. Doctor Brian examined plaintiff and diagnosed her injuries as a bruised left shoulder and bruised left knee cap. Plaintiff was examined by Doctor Brian weekly for a period of about one month and continued to complain of pain in the left knee and some discomfort in the neck. However, her condition improved, and on April 9, 1974, Doctor Brian informed plaintiff that she could return to work in two weeks. Plaintiff received weekly workmen’s compensation payments from March 12, 1974, until April 23, 1974 (the date on which she returned to work).
Plaintiff returned to her job and worked until the end of July, 1974. On June 27, 1974, plaintiff and her husband were examined by Dr. B. F. Chicóla, a general practitioner, for evidence of the disease of disseminated lupus erythematosis, a fatal ailment with which their daughter was afflicted. Doctor Chicola’s examinations were negative, and plaintiff made no complaints of injury to him at that time. She returned to Doctor Chicóla on July 22, 1974, with complaints of pain and swelling in her right knee. Doctor Chicóla examined plaintiff only once relative to this condition and diagnosed her problem as os-teo-arthritis.
Unable to perform her work duties due to the swelling and pain in her right knee, plaintiff went on paid sick leave from Penney’s at the beginning of August, 1974.
On August 20, 1974, plaintiff was examined by Dr. David Carlton, a general practitioner, concerning the pain and swelling still persistent in her right knee. She gave no history of an injury to the knee to Doctor Carlton, nor had she given one in her prior examination to Doctor Chicóla. Doctor Carlton found tenderness over the right medial collateral ligament in the right knee and diagnosed the condition as a strained or sprained ligament. After a subsequent examination on August 24, 1974, he confirmed that diagnosis. However, upon examining the plaintiff on September 7, 1974, he was informed by her that her right knee had a tendency to lock. This additional symptom caused Doctor Carlton to alter his diagnosis and conclude that plaintiff probably had some foreign body in the joint which caused the locking of the knee.
*146 Doctor Carlton referred plaintiff to Doctor T. E. Banks, an orthopedic surgeon, who first examined her on September 16, 1974. He diagnosed her condition as internal derangement of the right knee with a probable tear of the meniscus. Doctor Banks performed surgery on the plaintiff on September 20, 1974, and found a torn lateral meniscus and post-traumatic synovi-tis, and he surgically remedied both of these conditions. Doctor Banks examined the plaintiff a total of five times following the surgery and was satisfied with the progress of her recovery. On December 30, 1974, he released plaintiff from his care and felt that she was able to return to work at that point.
A mere three weeks thereafter, on January 20, 1975, plaintiff returned to Doctor Banks with further complaints of pain and swelling in her right knee. After a subsequent examination on February 10, 1975, Doctor Banks suggested further surgery to determine the cause of plaintiff’s condition. Surgery was performed on April 2, 1975, and Doctor Banks found that the articular cartilage of the medial femoral condyle was badly worn, and replaced plaintiff’s right knee joint with a prosthesis at that time.
Defendant’s basic contention is that plaintiff’s failure to complain about the torn meniscus of the right knee for a period of approximately four months following her fall precludes any causal connexity between that injury and the accident. We note that the concensus of the medical evidence is to the effect that a torn meniscus is accompanied by a certain degree of pain. Hence we tend to agree with defendant’s argument that if the plaintiff had suffered the torn meniscus in early March she should have experienced enough pain to complain of it or seek medical treatment for it prior to July 22, 1974, especially in light of the fact that she was examined by Doctor Brian no less than five times for her left knee in the month following her fall. We do note, however, that there was considerable testimony from members of plaintiff’s family that her right knee did bother her immediately after the fall, although not to any great degree. However, we are of the opinion that plaintiff’s disability is based upon factors other than and in addition to the torn meniscus, and said disability is not restricted solely to that injury.
When. Doctor Banks performed his initial surgical procedure on plaintiff in September he found “chronic post-traumatic synovitis and a tear of the lateral meniscus”. Synovitis is defined in Stedman’s Medical Dictionary, 2d Lawyers Edition (1966) as: “Inflamation of a synovial membrane, especially that of a joint; ar-thromeningitis; in general, when unqualified, the same as arthritis.”
Doctor Banks testified that:
“There was quite a bit of synovia reaction showing that this disease process had been present for a little while—I mean it wasn’t a real acute thing that happened a few days previously because there had been enough time for the syn-ovium to become rather thickened, and almost suggested a rheumatoid arthritis, but the microscope showed this was not true.”
Thus the condition which disabled plaintiff in August of 1974, was not limited to the torn meniscus, but instead was also contributed to by the post-traumatic syno-vitis. Since synovitis is essentially an arthritic condition, and in this case traumatically induced, it is not unreasonable to conclude that the disease process did not manifest itself immediately after the accident, but instead gradually progressed.
Doctor Banks’ second operation on the plaintiff, more than five months thereafter, revealed a wearing away of the articular cartilage of the medial femoral condyle. As to that condition Doctor Banks testified as following:
“Q. Is that a form of arthritis ?
A. Yes.
*147 Q. Is it a form of traumatic arthritis?
A. Yes, it can be a traumatic arthritis —it can be traumatic in origin, and with this appearing this rapidly it would almost have to be if it was not a rheumatoid arthritis, and we could not prove rheumatoid arthritis on her, so I would have to say it would be more apt to be traumatic than true degenerative osteoarthritis.

Q. Doctor you do feel that the arthritis that necessitated your operating [sic] her knee in both occasions was traumatically induced, don’t you?
A. Well of course I will have to say yes to that pretty well even though she did have some spurs that were osteoarthritic, and she had some slight bow leg deformity, and she’s 49 years of age—the rest of the joint surface was clear and the original findings of a torn lateral cartilage plus the proliferated syn-ovitis that was probably post-traumatic, these findings would have to be due to trauma—the marked progressive degeneration that came on so rapidly over the medial con-dyle of the femur that we found at the second operation would have to be related to trauma because it was just too fast to be osteoarthritic, so I would have to say the changes are most likely primarily post-traumatic.”
When queried about the possibility of an intervening trauma between the two operations Doctor Banks stated:
“A. I really don’t think that further trauma would have caused this marked change in this short period of time—I think the changes were there—underlying changes were there, and as she walked on it after the first operation and gradually put more and more weight, and more and more use of it, then the articular cartilage just started deteriorating and then it really went fast. Like I said I’m at little bit of a loss to pinpoint the stages, because I just don’t think I’ve ever seen the inside of a knee look this bad six months after I have seen the same joint myself—There had to be something going on prior to the first operation that had already laid the seed for this degeneration, and then I think just the passage of time and further weight bearing just caused it to progress rapidly.”
Finally, concerning the determination of the time at which the trauma occurred, the following testimony was elicited from Doctor Banks:
“Q. Could it have happened in early March of the same year ?
A. Yes, six months yes.”
Defendants may argue that plaintiff has failed to show the causal connexity between her accident and the subsequent syn-ovitis and arthritis because of Doctor Banks’ failure to make any absolute statements regarding these matters. However, in the case of Weber v. McLean Trucking Company, Inc., 265 So.2d 628 (La.App.3rd Cir. 1972), we stated:
“A court, in applying medical evidence to facts in a case of this kind, has to apply common sense and everyday experience to correctly resolve a situation. We know medical science knows more about these things than we do, and our experience has been, from hearing testimony of this kind, that when a doctor says ‘possible’ or ‘probable’, he does not mean that it did not happen as contended in the sense that an ordinary layman would understand his words. In giving their testimony, all medical experts try to give guarded testimony, and some courts try to draw a distinction between *148 possibilities and probabilities. To our way of thinking and to the modern trend of the courts in considering these terms, we should look at them in a commonsense way.”
In the case of Chelette v. Travelers Insurance Company, 324 So.2d 915 (La.App. 3rd Cir. 1975), we quoted with approval from Roberson v. Liberty Mutual Insurance Company, 316 So.2d 22 (La.App.3rd Cir. 1975) [1] as follows:
“The disability of a workmen’s compensation claimant ‘is presumed to have resulted from [the] accident, if before the accident the injured person was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves afterwards, provided that the medical evidence shows there to be a reasonable possibility of causal connection between the accident and the disabling condition.’ ”
While plaintiff’s symptoms did not appear immediately after the accident in this case it is significant to note that her disabilities were caused by synovitis and arthritis, neither of which being of the nature of diseases which manifest themselves immediately after the trauma which induces them. Plaintiff was relatively healthy prior to her fall even though there was some disputed testimony to the effect that she suffered from some slight degree of osteoarthritis in the knees prior to her fall. Because of the nature of her injury and the natural delay in the appearance of her disabling conditions, it is virtually impossible for plaintiff to prove with absolute certaintly the ultimate cause of her disability. Suffice it to say that the trial judge was satisfied that a sufficient causal link existed between plaintiff’s fall and her subsequent disability. After carefully reviewing the facts of this case we are unable to conclude that the District Judge committed manifest error.
For the above and foregoing reasons the judgment of the District Court is affirmed. Costs of this appeal are assessed to defendants-appellants.
AFFIRMED.

. The Roberson case was reargued before a five judge panel pursuant to an order of the Supreme Court in accordance with Article 5, Section 8(B) of the Constitution of 1974, 320 So.2d 201 (La.1975), and after reargument, the decision was reinstated. 321 So.2d 398 (LaApp. 3rd Cir. 1975).